1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ZIMMERMAN REED LLP**
Caleb Marker (CA 269721)
6240 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781
E-mail: caleb.marker@zimmreed.com

[Additional counsel listed below]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

SAMUEL EDWARDS, MICHELLE BROWN, DENNIS DEPEW, CINTHIA DAVIS MARITZA HERNANDEZ, SIOSIUA MAFOA, JOHN DOE, AALANY MCMAHAN, and DEBJANI SARKAR, individually and on behalf of all others similarly situated,

               Plaintiffs,

   v.

MUBI, INC.,

               Defendant.

Case No. 5:24-cv-00638-EJD

*Assigned to the Honorable Edward J Davila*

**FIRST AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs Samuel Edwards, Michelle Brown, Dennis Depew, Cinthia Davis, Martiza Hernandez, Siosiua Mafoa, John Doe, Aalany McMahan, and Debjani Sarkar ("Plaintiffs"), individually and on behalf of all other persons similarly situated ("Class Members"), by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.  Defendant MUBI, Inc., ("MUBI") is an online "global streaming service, production company and film distributor dedicated to elevating great cinema."[1] MUBI has installed "tracking pixels" on its website. These tracking pixels secretly and surreptitiously send consumers' viewing histories to third-party providers like Meta Platforms, Inc. ("Meta" or "Facebook"), TikTok, Inc. ("TikTok"), Google Analytics and/or X Corp., formerly known as Twitter ("X") (collectively, "Unauthorized Third Parties"), without their consent, in violation of the Video Privacy Protection Act ("VPPA") and California Civil Code § 1799.3.

2.  As Congress has recognized, "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. At 10 (Aug. 3, 1988)). Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details. *Id*. In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye." *Id*.

3.  The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id*.

---

[1] MUBI, https://help.mubi.com/article/21-what-is-mubi#:~:text=MUBI%20is%20a%20global%20streaming,audiences%20all%20over%20the%20world (last accessed 10/19/2023).

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

4.    MUBI violated the VPPA by knowingly disclosing personal information ("PI") and personally identifiable information ("PII")—including the specific videos and video services Plaintiffs and Class Members requested and obtained—to Unauthorized Third Parties without their consent. MUBI installed computer code on its website, at least, called the "Meta Tracking Pixel," "MUBI's New TikTok Pixel," and "Twitter Pixel" which track and record Plaintiffs and Class Members' private video consumption. Behind the scenes of many key MUBI webpages—and unbeknownst to video viewers— this code collects Plaintiffs and Class Members' video-consumption history and discloses it to Unauthorized Third Parties without their consent. The Unauthorized Third Parties, in turn, use Plaintiffs and Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.

5.    Mubi's website and app use first-party and third-party cookies, software development kits ("SDK"), pixels, Facebook's Business Tools, including Advanced Matching and Conversion API, Google Analytics, and related tracking tools to purposely track, record, and transmit its digital subscribers' interactions with mubi.com.

6.    Mubi knowingly installed and used these tools, and it controlled which data was transmitted to Unauthorized Third Parties.

7.    In conjunction with this, it purposefully and specifically chose to: (1) track and record consumers viewed video media, (2) disclose that information to Facebook alongside its digital subscribers' individual Facebook ID and other persistent identifiers, and (3) did this without its users' knowledge or consent via surreptitious technology.[2]

8.    Importantly, when MUBI transmitted Plaintiffs' and other consumers' personal viewing information (their persistent Facebook ID and viewed video content) that information was combined and sent to Facebook as one data point, thereby revealing the identity of the individual who requested or viewed a specific video.

---

[2] Notably, Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

1
2
3
4
5

9.      Because a Facebook ID is used to identify a specific individual and their corresponding Facebook account, Facebook or any ordinary person can use it to locate, access, and view a particular digital subscriber's Facebook profile, thereby revealing their identity. Put simply, the information Defendant shares with Facebook reveals each and every video a particular digital subscriber has requested or viewed.

6
7
8

10.     Plaintiffs and similarly situated consumers were harmed by Mubi's unlawful conduct, which deprives them of their right to privacy in their own homes, and the disclosures at issue reveal highly personal details regarding their unique video requests and viewing habits.

9

## PARTIES

10
11
12
13

11.     Plaintiff Samuel Edwards is an individual over 18 years old, and has been at all relevant times, a citizen of California. Plaintiff Edwards is a subscriber to MUBI's website, and he requested or obtained specific video materials or services from the website. Plaintiff Edward visited the site on his web browser to watch videos while he was logged into his facebook.com account on that same browser.

14
15
16
17

12.     Plaintiff Michelle Brown is an is an individual over 18 years old, and has been at all relevant times, a citizen of Virginia. Plaintiff Brown requested or obtained specific video materials or services from the website. Plaintiff Brown visited the MUBI website on her web browser to watch videos while she was logged into her facebook.com account on that same browser.

18
19
20
21
22

13.     Plaintiff Dennis Depew is an is an individual over 18 years old, and has been at all relevant times, a citizen of California. Plaintiff Depew is a subscriber of Defendant's website and requested or obtained specific video materials or services from the website. Plaintiff Depew visited the MUBI website on his web browser to watch videos while he was logged into his facebook.com account on that same browser.

23
24
25
26
27

14.     Plaintiff Cinthia Davis is an is an individual over 18 years old, and has been at all relevant times, a citizen of Illinois. Plaintiff Davis is a subscriber of Defendant's website and requested or obtained specific video materials or services from the website. Plaintiff Davis visited the MUBI website on her web browser to watch videos while she was logged into her facebook.com account on that same browser.

28

15.     Plaintiff Martiza Hernandez is an is an individual over 18 years old, and has been at all relevant times, a citizen of California. Plaintiff Hernandez is a subscriber of Defendant's website and requested or obtained specific video materials or services from the website. Plaintiff Hernandez visited the MUBI website on her web browser to watch videos while she was logged into her facebook.com account on that same browser.

16.     Plaintiff Siosiua Mafoa is an is an individual over 18 years old, and has been at all relevant times, a citizen of California. Plaintiff Mafoa is a subscriber of Defendant's website and requested or obtained specific video materials or services from the website. Plaintiff Mafoa visited the MUBI website on her web browser to watch videos while she was logged into her facebook.com account on that same browser.

17.     Plaintiff John Doe is an individual over 18 years old, and has been at all relevant times, a citizen of Ohio who resides in Hamilton County.  John Doe visited the MUBI website on his Google Chrome browser to watch videos and he requested or obtained specific video materials or services from the website. Plaintiff Doe was logged into his facebook.com account on that same Google Chrome browser.

18.     Plaintiff Aalany McMahan is an individual over 18 years old, and has been at all relevant times, a citizen of California. Aalany McMahon has visited the MUBI website on her web browser and requested or obtained specific video materials or services from the website. Plaintiff McMahon visited the site on her web browser to watch videos and was logged into her facebook.com account on that same web browser.

19.     Plaintiff Debjani Sarkar is an individual over 18 years old, and has been at all relevant times, a citizen of California. Plaintiff Sarkar is a subscriber of Defendant's website and requested or obtained specific video materials or services from the website. Plaintiff Sarkar visited the MUBI website on her web browser to watch videos while she was logged into her facebook.com account on the same browser.

20.     Defendant MUBI, Inc. is a Delaware corporation with its principal place of business at 215 Park Avenue South Fl. 12, New York, New York 10003.  Defendant MUBI Inc.'s streaming platform is used throughout California and the United States. Defendant developed, maintained, owns

and/or operates the website.

**JURISDICTION AND VENUE**

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA).  This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the Class, and there is minimal diversity.

22.     This Court has personal jurisdiction over Defendant because it conducts substantial business within California, including the sale, marketing, and advertising of MUBI.  Furthermore, a substantial portion of the events giving rise to Plaintiffs' claims occurred in this state.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.  In particular, MUBI disclosed Plaintiffs' video viewing information to at least one Unauthorized Third Party which resides in this District.

**FACTUAL BACKGROUND**

**A.     The VPPA**

24.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

25.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines PII as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

26.     As Senator Patrick Leahy explained, the VPPA was particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance. These 'information pools' create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard. The bill prohibits video stores from disclosing "personally identifiable information"—information that links the customer or patron to particular materials or services. In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

27.     The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction oriented. It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider." S. Rep. 100-599, at 12.

**B.      Cal. Civ. Code § 1799.3**

28.     Cal. Civ. Code § 1799.3 provides a wider breadth of protection for consumers by requiring that:

> No person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual.

29.     Cal. Civ. Code § 1799.3 does not require that the information being disclosed by video recording sales or rental service providers be *identifiable* to any one particular person. Instead, the statute forbids the disclosure of generalized "personal information" without that person's consent, even

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

if that information does not serve to identify them. The statute also forbids the mere disclosure of "the contents of any record, including sales or rental information," such as the mere title of the movie ticket purchased. We know the statute *independently* forbids the "contents of any record," from being disclosed without consent because the phrase is preceded by the word, "or" – not "and." Under California law, "the plain and ordinary meaning of the word 'or,' when used in a statute, is to designate separate, disjunctive categories. The word 'or' suggests alternatives. In its ordinary sense in a statute, the function of the word 'or' is to mark an alternative such as 'either this or that.'" *In re E.A.*, 24 Cal. App. 5th 648, 661 (2018) (cleaned up).

### C. The Meta Tracking Pixel

30. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[3] Facebook describes itself as a "real identity platform,"[4] meaning users are allowed only one account and must share "the name they go by in everyday life."[5] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[6]

31. Meta owns facebook.com and generates revenue by selling advertising space on this website, and other applications it owns, like Instagram.[7]

32. Meta sells advertising space by highlighting its ability to target users.[8] Meta can target users so effectively because it surveils user activity both on and *off its site*.[9] This allows Meta to make

---

[3] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com/.

[7] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[8] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[9] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[10] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

33. Advertisers can also build "Custom Audiences."[12] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[13] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[14] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15] One such Business Tool is the Meta Tracking Pixel.

34. The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[16] When the Meta Tracking Pixel captures an action, it sends a record to Facebook. Once this

---

[10] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[11] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[12] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[13] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[14] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[15] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[16] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

35.     Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[17]  Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[18]  An advertiser can also create their own tracking parameters by building a "custom event."[19]

36.     Advertisers control how the Meta Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[21]  Pixel-specific Data includes "the Pixel ID and cookie."[22]

**D.    MUBI and the Meta Tracking Pixel**

37.     MUBI is an online "global streaming service, production company and film distributor dedicated to elevating great cinema."[23]  It has a variety of paid monthly and annual subscriptions options, which begin with a seven-day free trial.[24]  To sign up, consumers create an account and choose a password.

---

[17] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[18] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[19] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[20] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[21] *Id.*

[22] *Id.*

[23] *Supra* note 1.

[24] MUBI, https://mubi.com/en/us/memberships (last accessed 10/19/2023).

9

38.     From the moment consumers enter MUBI's website, Defendant invites a stalker—in the form of, at least, the Meta Tracking Pixel—to follow them and carefully watch their every move.  MUBI consumers expect a movie night alone in the privacy of their own home; they do not expect to have their viewing histories recorded and sent to third parties through the use of tracking pixels.

39.     The Meta Tracking Pixel watches exactly what consumers choose to watch once they enter MUBI's library of movies.  The title of every film on MUBI is reflected in the URL of the page.  And MUBI has configured the Meta Tracking Pixel on its website to create a PageView event every time a consumer goes to the webpage page playing the video.  And the PageView invariably discloses the URL of the webpage, which contains the video title.

40.     For example, if a consumer picks the movie *Passages* from the MUBI library and loads the page including the video player, the PageView event discloses to Meta the URL of the page: https://mubi.com/en/us/films/passages-2022.  See Figures 1-2.  Similarly, if a consumer picks the movie *Rosie Plays Julie*, the PageView event discloses to Meta the URL of the page: https://mubi.com/en/us/films/rosie-plays-julie.  *See* Figures 3-4.  This information allows Meta to know whether a specific consumer has requested or obtained a specific video.

**Figure 1**



**Figure 2**

 

**Meta Pixel Helper**
Learn More

One pixel found on mubi.com

 Meta Pixel
Pixel ID: 1386672991571306 click to copy

Troubleshoot Pixel

Set Up Events 

▼ ✔ PageView

ADVANCED MATCHING PARAMETERS SENT

em: Show
external_id: Show
subscription_id: Show

EVENT INFO

Setup Method: Manual
URL called: Show
Load Time: 92.76 ms
Pixel Location: Hide

https://mubi.com/en/us/films/passages-2022

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

**Figure 3**



**Figure 4**



FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

41.     When a visitor watches a video on MUBI while logged into Facebook, Defendant compels a visitor's browser to transmit an identifying "computer cookie" to Meta called "c_user." The c_user cookie contains that visitor's unencrypted Facebook ID. When accessing the movie shown above, for example, the MUBI website is configured to have the user's browser send various cookies to facebook.com. See Figure 5.



**Figure 5**

42.     The c_user cookie is PII because it contains a consumer's unencrypted Facebook ID. A Facebook ID allows *anybody*—not just Facebook—to identify the individual consumer. Specifically, if one types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.     For example, the c_user cookie in Figures 3-5 above is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

43. The Meta Tracking Pixel transmits additional cookies to Meta.

44. The "fr" cookie contains, at least, an encrypted Facebook ID and browser identifier.[25] Facebook, at a minimum, uses the fr cookie to identify particular users.[26]

45. Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses this for targeted advertising.

46. The Meta Tracking Pixel uses both first and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, MUBI.[27] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[28]

47. Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

48. A Facebook ID is PII. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com/.

49. Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, that a given consumer subscribed to MUBI. And once the consumer accesses the MUBI library of videos, these identifiers also allow Meta to know exactly which particular videos a consumer has requested and obtained.[29]

50. MUBI begins to collect this information through tracking pixels when a user first signs up for an account.

51. Defendant discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a subscriber's subsequent activity on MUBI.

---

[25] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[27] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[28] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[29] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

52.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

53.     Meta confirms that it matches activity on MUBI with a user's profile. Meta allows users to download its "off-site activity," which is a "summary of activity that businesses and organizations share with [it] about [consumers'] interactions, such as visiting [organizations'] apps or websites."[30] The off-site activity report confirms MUBI identifies an individual's video viewing activities. *See, e.g.*, Figure 21.

**E.     MUBI and Other Third-Party Tracking Pixels**

54.     Besides installing the Meta Tracking Pixel, Defendant also installed at least the TikTok Tracking Pixel and Twitter Pixel to track consumers' every move while on MUBI's website. The TikTok and Twitter tracking pixels all work in much the same way as the Meta Tracking Pixel.

55.     Like the Meta Tracking Pixel, when a consumer requests or obtains specific video content, these various Tracking Pixels generate additional events which are aggregated by the Unauthorized Third Parties.

56.     For example, the TikTok Tracking Pixel generates events titled "Page View" and "View Content" This event also reveals the title of the video content the consumer chose to view, the "Load Time" of the content, and a corresponding timestamp. The TikTok Tracking Pixel does not simply disclose what video content a consumer has requested or obtained, it discloses exactly when the consumer's request was made. *See* Figures 6 and 7.

---

[30] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627. As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity." What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

**Figure 6**



FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

**Figure 7**

| Name | Value | Domain |
|------|-------|--------|
| _ga_HV1FL86553 | GS1.1.1701229179.1.0.1701229179.60.0.0 | .tiktok.com |
| tta_attr_id | 0.1701229178.7306723683656007682 | .tiktok.com |
| passport_csrf_token | 9e315b89787bd71b95cf5a577765eb8f | .tiktok.com |
| msToken | 5Le1_NCbQnUOpU6tZpFHxjhNNhBvIXJRj6LBBq2t2QAuccQ... | .tiktok.com |
| ttwid | 1%7Ci9I-5xdbxhyEev8uBxOi0oVabZ1IjaStgnxQKuRa480%7... | .tiktok.com |
| _ga | GA1.1.229250433.1701229180 | .tiktok.com |
| tta_attr_id_mirror | 0.1701229178.7306723683656007682 | .tiktok.com |
| part | stable | .tiktok.com |
| _ttp | 2N9DjdnBA0ieNcx6dmgiT2BSPe2 | .tiktok.com |

57.     TikTok employs multiple cookies and uses them to learn about MUBI consumers. TikTok then uses the information it gathers to deliver MUBI's ads "more efficiently to people who are likely to convert (into a paying customer)."[31]

58.     Similarly, the Twitter Pixel also discloses the URL of the webpage, which contains the title of the video, along with multiple cookies that can be used to identify particular users. *See* Figures 8 and 9.

---

[31] TikTok, COOKIES WITH TIKTOK PIXEL, https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?redirected=2.

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

**Figure 8**



**Figure 9**

| Name | Value | Domain |
|---|---|---|
| auth_token | 87a44bd3341ed7e9701efe1e28... | .twitter.com |
| dnt | 1 | .twitter.com |
| guest_id | v1%3A170447243097764464 | .twitter.com |
| guest_id_ads | v1%3A170447243097764464 | .twitter.com |
| guest_id_marketing | v1%3A170447243097764464 | .twitter.com |
| personalization_id | "v1_2J6InmQA0v+IhvTLaYhA4Q... | .twitter.com |
| twid | u%3D1734393131683151873 | .twitter.com |

**F.    MUBI Fails to Obtain Proper Consent**

59.    While MUBI has been disclosing consumers' PII to Meta and has been disclosing consumers' personal information, including private video viewing information, to other Unauthorized Third Parties, it has not properly obtained consumer consent as required by the VPPA and Cal. Civ. Code § 1799.3.

19

60.     The VPPA only allows a video tape service provider to disclose PII of a consumer to a third party "with the informed, written consent (including through an electronic means using the Internet) of the consumer that—(i) is in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer." 18 U.S.C. § 2710(B)(i).  The video tape service provider must also "provide[] and opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(B)(iii).

61.     Under Cal. Civ. Code § 1799.3, a person providing video recording sales or rental services must obtain written consent of the individual whose personal information or records of sales or rental information is being disclosed.

62.     MUBI failed to meet the consent requirements under both VPPA and Cal. Civ. Code § 1799.3 because at no point did MUBI obtain informed, written consent, in a separate and distinct form (as required by VPPA), or simply written consent (as required by Cal. Civ. Code § 1799.3) from consumers.

63.     On MUBI's initial screen that a person would land on if they are not already subscribed and logged into their account, MUBI offers consumers to try a seven-day free trial of their service.[32] Below the prominent blue box stating "GET STARTED," MUBI includes a line of text in a small font size that states: "By clicking 'Get started' you are indicating that you have read and agree to the <u>Terms of Service</u> and <u>Privacy</u>."  These hyperlinks are not reasonably conspicuous because they are buried at the bottom of a large screen, in small white font, below the much larger, blue GET STARTED button. MUBI has done nothing to distinguish these subtle hyperlinks other than to underline them.  And this small plain text is drowned out by the video cut-scene playing in the background of the screen.  *See* Figures 10-11.

---

[32] *Supra* note 23.

**Figure 10**



**Figure 11**



64.    Later in the sign-up process, on the screen where consumers enter their payment information, MUBI makes a similar statement linking its "Terms & Conditions."

FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

**Figure 12**



65.     The "Terms of Service," "Privacy," and "Terms & Conditions" sections of text are hyperlinks to separate webpages containing MUBI's full Terms of Service and Privacy Policy. There is no separate page entitled "Terms & Conditions."

66.     Within MUBI's Privacy Policy, under section four titled "Disclosing Information," MUBI states that it shares consumer's PII "with advertisers, ad servers, and ad networks (including but not limited to Google Analytics, Facebook Pixel, and Facebook Offline Events) to select and deliver advertising and content, and target and personalize advertising content both on our sites and on selected partner sites."[33]

67.     MUBI's inclusion of its practice of sharing PII to Meta is insufficient to meet the VPPA's requirement of obtaining "informed, written consent … *in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer*" because it is stated within the Privacy policy and not in a separate and distinct form.  18 U.S.C. § 2710(B)(i).  At no point did MUBI obtain informed, written consent in a separate and distinct form.  Instead, MUBI has buried this information within the same Privacy Policy that MUBI has drafted to meet its other legal obligations under different data privacy laws.

---

[33] MUBI, https://mubi.com/en/privacy_policy (last accessed October 20, 2023).

68.     MUBI also fails to fulfill VPPA's requirement of providing consumers with "an opportunity in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. § 2710(B)(iii).  At no point does MUBI give consumers the opportunity to withdraw from ongoing disclosures of their PII in a clear and conspicuous manner.  Instead, information on how to opt-out of MUBI's practice of sharing consumers' PII is buried several pages deep within its Privacy Policy, at the end of section nine.[34] Figures 13-17, below, show where in the privacy policy a consumer's ability to opt-out of the Meta Tracking Pixel collection is buried.



**Figure 26**

**Figure 27**

**Figure 13**          **Figure 14**          **Figure 15**

69.     Even the link to the Privacy Policy is not provided in a clear and conspicuous manner. The font of the Privacy policy link is "considerably smaller than the font used in the surrounding website elements" and is surrounded by "comparatively larger font used in all of the surrounding text."  *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-57 (9th Cir. 2022); Figures 18-20.  The main visual element of the screen is the background which consists of rolling clips of movies available on

---

[34] *Supra* note 31.

MUBI.  *See id.*  The movie clip visual element, along with the larger font text elsewhere on the page, "naturally directs the user's attention everywhere else" but the Privacy policy.  *See Berman*, 30 F.4th at 857.  Further, while MUBI includes a hyperlink to its Privacy policy and underscores the word "Privacy," it deemphasizes the existence of the hyperlink to the Privacy Policy by not using additional methods, such as contrasting the font color and using the color blue (which usually denotes the existence of a hyperlink).  *See id.*  Notably, the Ninth Circuit has held that "a web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text."  *Id.* (finding that the terms and conditions hyperlink, which was underscored, was a "failure to clearly denote the hyperlink[]" and "fail[ed] [the] conspicuousness test").

**Figure 18**



FIRST AMENDED CLASS ACTION COMPLAINT – 5:24-CV-00638-EJD

**Figure 19**



**Figure 20**



70.     Beyond its failure to obtain proper consent according to the statutes at issue, MUBI also failed to obtain consent from any of the named Plaintiffs as well as the class members.

**G.     Experience of Plaintiff John Doe**

71.     Prior to creating an account with MUBI, Plaintiff John Doe created a Facebook account, which is associated with his real (legal) name and email address. Because Plaintiff Doe's Facebook profile and email address contain his name, Plaintiff Doe can be personally identified with that information.

72.     In or around March 2022, Plaintiff Doe created a MUBI account. Once Plaintiff Doe created an account, Defendant disclosed his PII to Meta.

73.     As part of his use of the website, Plaintiff Doe regularly requested or obtained specific video materials or services.

74.     Since creating a MUBI account, Plaintiff Doe frequented MUBI to watch videos on a regular basis, including within the last two (2) years.

75.     Each time Plaintiff Doe requested or obtained specific video materials or services from MUBI, Defendant disclosed his event data, which recorded and disclosed the video's title to Meta. Defendant also disclosed identifiers for Plaintiff Doe including the c_user and fr cookies to Meta.

76.     By disclosing his event data and identifiers, Defendant disclosed Plaintiff Doe's PII to Meta.

77.     Plaintiff Doe did not consent to the disclosure of his PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Doe's consent in a form separate and distinct from other legal and financial obligations.

78.     Plaintiff Doe discovered that Defendant surreptitiously collected and transmitted his PII in October 2023.

79.     Meta confirmed on Plaintiff Doe's Facebook account that it had collected his interactions with mubi.com—in other words, Meta confirmed it received a list of films Mr. Doe requested and obtained on the website, just as a newspaper reporter received a list of dozens of films Judge Bork rented from Blockbuster 35 years ago.

**Figure 21**



80.     Defendant did not provide Plaintiff Doe with an opportunity to withdraw from the disclosure of his PII.

81.     Plaintiff was harmed by not having the ability to opt-in to his privacy sharing and lost control over his personal information as a result. Because MUBI never clearly and conspicuously notified him it was even sharing his data with Unauthorized Third Parties, including at least, Meta, (and never disclosed it was sharing his data with X or TikTok at all), he never even had reasonable notice that such data collection was even taking place, let alone what steps he could take to control it.

82.     Plaintiff John Doe values his privacy and wishes to proceed with this privacy case anonymously. He fears that the public disclosure of his video viewing history and the fact he subscribed to MUBI in connection with this lawsuit will subject him harassment, ridicule, embarrassment, and potential retaliation.

**H.      Experience of Plaintiff Aalany McMahan**

83.     Prior to creating an account with MUBI, Plaintiff Aalany McMahan created a Facebook account which is associated with her real (legal) name and email address. Because Plaintiff McMahan's

Facebook profile contains her name, Plaintiff McMahan can be personally identified with that information.

84.     Within the last two (2) years, and while she had an active Facebook account, Plaintiff McMahan created an account and subscribed to MUBI. To become a subscriber, Plaintiff McMahan provided Defendant with her name and email address. She also paid a subscription fee.

85.      Once Plaintiff McMahan created an account, Defendant disclosed her PII to Meta and other personal information to Unauthorized Third Parties.

86.     As part of her subscription, Plaintiff McMahan regularly requested or obtained specific video materials or services from the website. She frequented MUBI to watch videos on a regular basis, including within the last two (2) years.

87.     When Plaintiff McMahan watched videos on MUBI, Defendant disclosed her event data, which recorded and disclosed the video's title to Meta.  Defendant also disclosed identifiers for Plaintiff McMahan including the c_user and fr cookies to Meta.

88.     By disclosing her event data and identifiers, Defendant disclosed Plaintiff McMahan's PII to Meta.

89.     Plaintiff McMahan did not consent to the disclosure of her PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff McMahan's consent in a form separate and distinct from other legal and financial obligations.

90.     Defendant did not provide Plaintiff McMahan with an opportunity to withdraw from the disclosure of his PII.

91.     Plaintiff was harmed by not having the ability to opt-in to her privacy sharing and lost control over her personal information as a result.  Because MUBI never clearly and conspicuously notified her it was even sharing her data with Meta, (and never disclosed it was sharing her data with X or TikTok at all), she never even had reasonable notice that such data collection was even taking place, let alone what steps she could take to control it.

92.     Had Plaintiff McMahan been aware of Defendant's practices of disclosing PII, Plaintiff McMahan would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

93.     MUBI disclosed Plaintiff McMahan's personal information and video viewing data to Unauthorized Third Parties..

94.     Plaintiff McMahan discovered that Defendant surreptitiously collected and transmitted her PII in October 2023.

**I.      Experience of Plaintiff Samuel Edwards**

95.     Prior to creating an account with MUBI, Plaintiff Samuel Edwards created a Facebook account which is associated with his real (legal) name. Because Plaintiff Edwards' Facebook profile contains his name, Plaintiff Edwards can be personally identified with that information.

96.     While he had an active Facebook account, Plaintiff Edwards created an account and subscribed to MUBI. To become a subscriber, Plaintiff Edwards provided Defendant with his name and email address. He also paid a subscription fee.

97.      Once Plaintiff Edwards created an account, Defendant disclosed his PII and viewing information to Unauthorized Third Parties.

98.     As part of his subscription, Plaintiff Edwards requested or obtained specific video materials or services from the website. He utilized MUBI to watch videos, including during the relevant time period.

99.     When Plaintiff Edwards watched videos on MUBI, Defendant disclosed his event data, which recorded and disclosed the video's title to Meta.  Defendant also disclosed identifiers for Plaintiff Edwards including the c_user and fr cookies to Meta.

100.    By disclosing his event data and identifiers, Defendant disclosed Plaintiff Edwards' PII to Meta.

101.    Plaintiff Edwards did not consent to the disclosure of his PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Edwards' consent in a form separate and distinct from other legal and financial obligations.

102.    Plaintiff was harmed by not having the ability to opt-in to his privacy sharing and lost control over his personal information as a result.  Because MUBI never clearly and conspicuously notified him it was even sharing his data with Meta, (and never disclosed it was sharing his data with X

or TikTok at all), he never even had reasonable notice that such data collection was even taking place, let alone what steps he could take to control it.

103.    Defendant did not provide Plaintiff Edwards with an opportunity to withdraw from the disclosure of his PII.

104.    Had Plaintiff Edwards been aware of Defendant's practices of disclosing PII, Plaintiff Edwards would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

105.    Plaintiff Edwards discovered that Defendant surreptitiously collected and transmitted his PII in approximately December 2023.

**J.    Experience of Michelle Brown**

106.    Prior to creating an account with MUBI, Plaintiff Michelle Brown created a Facebook account which is associated with her real (legal) name. Because Plaintiff Brown's Facebook profile contains her name, Plaintiff Brown can be personally identified with that information.

107.    While she had an active Facebook account, Plaintiff Brown created an account and subscribed to MUBI. To become a subscriber, Plaintiff Brown provided Defendant with her name and email address. She also paid a subscription fee.

108.    Once Plaintiff Brown created an account, Defendant disclosed her PII and viewing information to Unauthorized Third Parties.

109.    As part of her subscription, Plaintiff Brown requested or obtained specific video materials or services from the website. She utilized MUBI to watch videos, including during the relevant time period.

110.    When Plaintiff Brown watched videos on MUBI, Defendant disclosed her event data, which recorded and disclosed the video's title to Meta.  Defendant also disclosed identifiers for Plaintiff Brown including the c_user and fr cookies to Meta.

111.    By disclosing her event data and identifiers, Defendant disclosed Plaintiff Brown's PII to Meta.

112.     Plaintiff Brown did not consent to the disclosure of her PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Brown's consent in a form separate and distinct from other legal and financial obligations.

113.     Plaintiff was harmed by not having the ability to opt-in to her privacy sharing and lost control over her personal information as a result.  Because MUBI never clearly and conspicuously notified her it was even sharing his data with Meta, (and never disclosed it was sharing her data with X or TikTok at all), she never even had reasonable notice that such data collection was even taking place, let alone what steps she could take to control it.

114.     Defendant did not provide Plaintiff Brown with an opportunity to withdraw from the disclosure of her PII.

115.     Had Plaintiff Brown been aware of Defendant's practices of disclosing PII, Plaintiff Brown would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

116.     Plaintiff Brown discovered that Defendant surreptitiously collected and transmitted his PII in approximately December 2023.

**K.     Experience of Plaintiff Dennis Depew**

117.     Prior to creating an account with MUBI, Plaintiff Dennis Depew created a Facebook account which is associated with his real (legal) name. Because Plaintiff Depew's Facebook profile contains his name, Plaintiff Depew can be personally identified with that information.

118.     While he had an active Facebook account, Plaintiff Depew created an account and subscribed to MUBI. To become a subscriber, Plaintiff Depew provided Defendant with his name and email address. He also paid a subscription fee.

119.      Once Plaintiff Depew created an account, Defendant disclosed his PII and viewing information to Unauthorized Third Parties.

120.     As part of his subscription, Plaintiff Depew regularly requested or obtained specific video materials or services from the website. He utilized MUBI to watch videos, including during the relevant time period.

121.    When Plaintiff Depew watched videos on MUBI, Defendant disclosed his event data, which recorded and disclosed the video's title to Meta. Defendant also disclosed identifiers for Plaintiff Depew including the c_user and fr cookies to Meta.

122.    By disclosing his event data and identifiers, Defendant disclosed Plaintiff Depew's PII to Meta.

123.    Plaintiff Depew did not consent to the disclosure of his PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Depew's consent in a form separate and distinct from other legal and financial obligations.

124.    Plaintiff was harmed by not having the ability to opt-in to his privacy sharing and lost control over his personal information as a result.  Because MUBI never clearly and conspicuously notified him it was even sharing his data with Meta, (and never disclosed it was sharing his data with X or TikTok at all), he never even had reasonable notice that such data collection was even taking place, let alone what steps he could take to control it.

125.    Defendant did not provide Plaintiff Depew with an opportunity to withdraw from the disclosure of his PII.

126.    Had Plaintiff Depew been aware of Defendant's practices of disclosing PII, Plaintiff Depew would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

127.    Plaintiff Depew discovered that Defendant surreptitiously collected and transmitted his PII in approximately December 2023.

**L.      Experience of Plaintiff Cinthia Davis**

128.    Prior to creating an account with MUBI, Plaintiff Cinthia Davis created a Facebook account which is associated with her real (legal) name. Because Plaintiff Davis's Facebook profile contains her name, Plaintiff Davis can be personally identified with that information.

129.    While she had an active Facebook account, Plaintiff Davis created an account and subscribed to MUBI. To become a subscriber, Plaintiff Davis provided Defendant with her name and email address. She also paid a subscription fee.

130.     Once Plaintiff Davis created an account, Defendant disclosed her PII and viewing information to Unauthorized Third Parties.

131.     As part of her subscription, Plaintiff Davis requested or obtained specific video materials or services from the website. She utilized MUBI to watch videos, including during the relevant time period.

132.     When Plaintiff Davis watched videos on MUBI, Defendant disclosed her event data, which recorded and disclosed the video's title to Meta.  Defendant also disclosed identifiers for Plaintiff Depew including the c_user and fr cookies to Meta.

133.     By disclosing her event data and identifiers, Defendant disclosed Plaintiff Davis's PII to Meta.

134.     Plaintiff Davis did not consent to the disclosure of her PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Davis's consent in a form separate and distinct from other legal and financial obligations.

135.     Plaintiff was harmed by not having the ability to opt-in to her privacy sharing and lost control over her personal information as a result.  Because MUBI never clearly and conspicuously notified her it was even sharing her data with Meta, (and never disclosed it was sharing her data with X or TikTok at all), she never even had reasonable notice that such data collection was even taking place, let alone what steps she could take to control it.

136.     Defendant did not provide Plaintiff Davis with an opportunity to withdraw from the disclosure of her PII.

137.     Had Plaintiff Davis been aware of Defendant's practices of disclosing PII, Plaintiff Davis would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

138.     Plaintiff Davis discovered that Defendant surreptitiously collected and transmitted her PII in approximately December 2023.

**M.     Experience of Plaintiff Maritza Hernandez**

139.     Prior to creating an account with MUBI, Plaintiff Maritza Hernandez created a Facebook account which is associated with her real (legal) name. Because Plaintiff Hernandez's Facebook profile

contains her name, Plaintiff Hernandez can be personally identified with that information.

140.     While she had an active Facebook account, Plaintiff Hernandez created an account and subscribed to MUBI. To become a subscriber, Plaintiff Hernandez provided Defendant with her name and email address. She also paid a subscription fee.

141.     Once Plaintiff Hernandez created an account, Defendant disclosed her PII and viewing information to Unauthorized Third Parties.

142.     As part of her subscription, Plaintiff Hernandez requested or obtained specific video materials or services from the website. She utilized MUBI to watch videos, including during the relevant time period.

143.     When Plaintiff Hernandez watched videos on MUBI, Defendant disclosed her event data, which recorded and disclosed the video's title to Meta.  Defendant also disclosed identifiers for Plaintiff Hernandez including the c_user and fr cookies to Meta.

144.     By disclosing her event data and identifiers, Defendant disclosed Plaintiff Hernandez's PII to Meta.

145.     Plaintiff Hernandez did not consent to the disclosure of her PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Hernandez's consent in a form separate and distinct from other legal and financial obligations.

146.     Plaintiff was harmed by not having the ability to opt-in to her privacy sharing and lost control over her personal information as a result.  Because MUBI never clearly and conspicuously notified her it was even sharing her data with Meta, (and never disclosed it was sharing her data with X or TikTok at all), she never even had reasonable notice that such data collection was even taking place, let alone what steps she could take to control it.

147.     Defendant did not provide Plaintiff Hernandez with an opportunity to withdraw from the disclosure of her PII.

148.     Had Plaintiff Hernandez been aware of Defendant's practices of disclosing PII, Plaintiff Hernandez would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

149. Plaintiff Hernandez discovered that Defendant surreptitiously collected and transmitted her PII in approximately December 2023.

**N.      Experience of Plaintiff Siosiua Mafoa**

150. Prior to creating an account with MUBI, Plaintiff Siosiua Mafoa created a Facebook account which is associated with his real (legal) name. Because Plaintiff Mafoa's Facebook profile contains his name, Plaintiff Mafoa can be personally identified with that information.

151. While he had an active Facebook account, Plaintiff Mafoa created an account and subscribed to MUBI. To become a subscriber, Plaintiff Mafoa provided Defendant with his name and email address. He also paid a subscription fee.

152. Once Plaintiff Mafoa created an account, Defendant disclosed his PII and viewing information to Unauthorized Third Parties.

153. As part of his subscription, Plaintiff Mafoa requested or obtained specific video materials or services from the website. He utilized MUBI to watch videos, including during the relevant time period.

154. When Plaintiff Mafoa watched videos on MUBI, Defendant disclosed his event data, which recorded and disclosed the video's title to Meta. Defendant also disclosed identifiers for Plaintiff Mafoa including the c_user and fr cookies to Meta.

155. By disclosing his event data and identifiers, Defendant disclosed Plaintiff Mafoa's PII to Meta.

156. Plaintiff Mafoa did not consent to the disclosure of his PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Mafoa's consent in a form separate and distinct from other legal and financial obligations.

157. Plaintiff was harmed by not having the ability to opt-in to his privacy sharing and lost control over his personal information as a result. Because MUBI never clearly and conspicuously notified him it was even sharing his data with Meta, (and never disclosed it was sharing his data with X or TikTok at all), he never even had reasonable notice that such data collection was even taking place, let alone what steps he could take to control it.

158.    Defendant did not provide Plaintiff Mafoa with an opportunity to withdraw from the disclosure of his PII.

159.    Had Plaintiff Mafoa been aware of Defendant's practices of disclosing PII, Plaintiff Mafoa would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

160.    Plaintiff Mafoa discovered that Defendant surreptitiously collected and transmitted his PII in December 2023.

### O.    Experience of Plaintiff Debjani Sarkar

161.    Prior to creating an account with MUBI in or around November of 2021, Plaintiff Debjani Sarkar created a Facebook account which is associated with her real (legal) name and email address. Because Plaintiff Sarkar's Facebook profile contains her name, Plaintiff Sarkar can be personally identified with that information.

162.    Within the last three (3) years, and while she had an active Facebook account, Plaintiff Sarkar created an account and subscribed to MUBI. To become a subscriber, Plaintiff Sarkar provided Defendant with her name and email address. She also paid a subscription fee.

163.    Once Plaintiff Sarkar created an account, Defendant disclosed her PII to Unauthorized Third Parties.

164.    As part of her subscription, Plaintiff Sarkar regularly requested and obtained specific video materials or services from the website. She frequented MUBI to watch videos on a regular basis, and she specifically recalls requesting and viewing "Lost."

165.    When Plaintiff Sarkar watched videos on MUBI, Defendant disclosed her event data, which recorded and disclosed the video's title to Meta.  Defendant also disclosed identifiers for Plaintiff Sarkar, including her c_user and fr cookies to Meta.

166.    By disclosing her event data and identifiers, Defendant disclosed Plaintiff Sarkar's PII to Meta.

167.    Plaintiff Sarkar did not consent to the disclosure of her PII, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff Sarkar's consent in a form separate and distinct from other legal and financial obligations.

168.     Plaintiff was harmed by MUBI's failure to comply with federal and state statutes, including its failure to obtain her consent prior to sharing her Personal Viewing Information, and has lost control over her personal information as a result. Because MUBI never clearly and conspicuously notified her it was sharing her data and the contents of her communications with Unauthorized Third Parties she never had reasonable notice that such data collection was even taking place, let alone what steps she could take to control it.

169.     Defendant did not provide Plaintiff Sarkar with an opportunity to withdraw from the disclosure of her PII.

170.     Had Plaintiff Sarkar been aware of Defendant's practices of disclosing PII, Plaintiff Sarkar would not have paid for a subscription to the website or would only have been willing to pay significantly less for the subscription.

171.     Plaintiff Sarkar did not discover that Defendant surreptitiously collected and transmitted her PII until approximately November 2023.

## CLASS ALLEGATIONS

172.     **Nationwide Class Definition**: Plaintiffs Edwards, Brown, Depew, Davis, Hernandez, Mafoa, Doe, McMahan, and Sarkar seek to represent a class of similarly situated individuals defined as:

> All persons in the United States who have  MUBI accounts and viewed videos on MUBI.com (the "Class").

173.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of an amended class definition, or the use of one or more subclasses.

174.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiffs do not know the exact number of members of the aforementioned Classes.  However, given the popularity of Defendant's website, the number of persons within both Classes are believed to be so numerous that joinder of all members is impractical.

175.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**: There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law

and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

    (a)    whether Defendant collected Plaintiffs' and the Classes' PII;

    (b)    whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

    (c)    whether Defendant's disclosures were committed knowingly;

    (d)    whether Defendant disclosed Plaintiffs' and the Classes' PII without consent; and

    (e)    whether Defendant's conduct violates California Civil Code § 1799.3.

176. **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, used MUBI to watch videos, and had their PII collected and disclosed by Defendant without their consent. Moreover, Plaintiff McMahan, like all members of the California Class, used MUBI to watch videos, and had her personal information shared with Unauthorized Third Parties in violation of Cal. Civ. Code § 1799.3.

177. **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and Cal. Civ. Code § 1799.3.  Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiffs nor their counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiffs may seek leave of this Court to amend this First Amended Class Action Complaint to include additional representatives to represent the Classes (or to address additional Classes), additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

178. **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts

in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

### Violation of the Video Privacy Protection Act

### 18 U.S.C. § 2710, *et seq.*

### (Plaintiffs Individually and on behalf of the Nationwide Class)

179. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

180. Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Class against Defendant.

181. Defendant is a "video tape service provider" as defined by the VPPA because it creates, hosts, and delivers thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendant provides a library of audiovisual material for a monthly or annual fee.

182. Plaintiffs are "consumers" as defined by the VPPA because they subscribe to and enroll in memberships to gain access to prerecorded videos and similar audio-visual materials available on Defendant's website. Plaintiff subscribed to and subsequently viewed various audio-visual materials available on MUBI. 18 U.S.C. § 2710(a)(1).

183. Defendant disclosed to Unauthorized Third Parties Plaintiffs' and the Nationwide Class members' PII. Defendant utilized, at least, the Meta Tracking Pixel to compel Plaintiffs' web browser

to transfer Plaintiffs' identifying information, like the Facebook ID, along with Plaintiffs' event data, like the title of the videos viewed.

184. Plaintiffs and the Nationwide Class members viewed videos using MUBI.

185. Defendant knowingly disclosed Plaintiffs' PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

186. Plaintiffs and Nationwide Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to Unauthorized Third Parties.

187. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

188. On behalf of themselves and the members of the Nationwide Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Nationwide Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## <u>COUNT II</u>

### Violation of California Civil Code § 1799.3

### (Plaintiffs Individually and on behalf of the Nationwide Class)

189. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

190. Plaintiffs bring this claim individually and on behalf of the members of the proposed California Class against Defendant.

191. Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales and rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

192.   Defendant is a "person providing video recording sales and rental services" because it offers consumers access to prerecorded video content for which subscribers to MUBI pay a monthly or other fee.

193.   Defendant disclosed to Unauthorized Third Parties, at least, TikTok, Google, Meta, and X, Plaintiffs' and the California Class members' personal information and/or the records of Plaintiffs' and California Class members' video viewing information.  Defendant utilized the TikTok, Meta, and X Tracking Pixels to compel Plaintiffs' web browser to transfer Plaintiffs' personal information, like their Facebook ID (to Meta's Tracking Pixel), along with Plaintiffs' event data, like the title of the movies they requested, the amount of time it took to load, and the specific date and time that Plaintiffs requested said video content.

194.   Plaintiffs and the California Class members requested, obtained, and viewed video content provided via MUBI.com.

195.   Defendant willfully disclosed Plaintiffs' personal information because it used that data to build audiences on Facebook and other websites to then retarget them for its advertising campaigns.

196.   Plaintiffs and California Class members did not provide Defendant with any form of consent – either written or otherwise – to disclose their personal information to Unauthorized Third Parties.

197.   On behalf of themselves and the California Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the California Class by requiring Defendant to comply with Cal. Civ. Code §1799.3's requirements for protecting a consumer's personal information; (iii) statutory damages of $500 for each violation of the Cal. Civ. Code §1799.3 pursuant to Cal. Civ. Code §1799.3I; and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT III**

**Violation of the California Invasion of Privacy Act ("CIPA")**

**Cal. Penal Code §§ 630 *et seq*.**

**(Plaintiffs Individually and on behalf of the Nationwide Class)**

198. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

199. CIPA outlines liability whereby a person, "by means of any machine, instrument, contrivance, or in any other manner," commits any of the following to another person: (i) intentionally tapped, or made by unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including wire, cable, or instrument of any internal telephonic communication system, or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

200. Courts have determined that section 631(a) applies to communications conducted over the internet. *See, e.g.*, *Yoon v. Lululemon U.S.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. Jul. 15, 2021).

201. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d. 589, 608 (9th Cir. 2020). The California Supreme Court has similarly concluded in regard to CIPA that the objective of the Act is to protect a person's communications from a situation where the other person on the other end of the line permits an outsider to monitor the communication. *See Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183,200 (2021).

202. California Penal Code section 637.2 provides a private right of action for violations of CIPA so that "[a] person who has been injured by a violation of [CIPA] may bring an action against the person who committed the violation ...."

203. Defendant conducts business in California, and California law governs their relationship with Subscribers.

204. The website, including, at least, the Unauthorized Third Parties' Pixels or other tracking tools installed on it, is a "machine, instrument, contrivance, or ... other manner" used to engage in the prohibited conduct at issue here.

205. Within the relevant time period, Plaintiffs used the website, including the search bar, to type text and phrases in order to request and view specific video content and titles. Each time they did this, the contents of their communications were intercepted and received by Unauthorized Third Parties, including the exact titles they request and viewed and any other text or phrases they typed into the search bar on Defendant's Website.

206. Within the relevant time period, Meta, without the consent of all parties to the communication, and without proper consent, willfully read or attempted to read or learn the contents or meaning of Plaintiffs' communications, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

207. Within the relevant time period, Meta willfully learned or attempted to learn the contents of Plaintiffs' video viewing histories between Plaintiffs and Defendant, through the website.

208. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed Meta to implement the Pixel and to accomplish the wrongful conduct outlined here.

209. This conduct violates sections 631 and 632 as an invasion of privacy sufficient to confer Article III standing.

210. Plaintiffs did not authorize or consent to the tracking interception, and collection of any of their electronic communications, in the form of their PII.

211. Defendant is liable to Plaintiffs and the Class for statutory damages of not less than $5,000 for each violation of CIPA, punitive damages, and attorneys' fees and costs.

**COUNT IV**

**Violation of the Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**

**(Plaintiffs Individually and on behalf of the Nationwide Class)**

212.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

213.     The UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq*., prohibits unfair, unlawful, and fraudulent business practices and acts.

214.     Defendant violated the UCL's unfair prong by repeatedly disclosing the personal information of Plaintiffs and the Class to Unauthorized Third Parties, including at least, Meta, without consent, as alleged above.

215.     Defendant's disclosure of Plaintiffs' and Class Members' personal information constitutes an "unfair" business practice because it offends an established public policy, as reflected in the VPPA, California Civil Code section 1799.3, and CIPA, and because it is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

216.     Defendant violated the UCL's unlawful prong by repeatedly sharing its subscribers' personal information with Unauthorized Third Parties, including at least, Meta, without consent, as alleged above.

217.     The UCL covers a wide range of conduct, embracing "anything that can properly be called a business practice and that at the same time is forbidden by law." *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1143 (2003). The UCL "'borrows'" violations from other laws by making them independently actionable as unfair competitive practices." *Id*.

218.     Defendant's above-described conduct violates the unlawful prong of the UCL, as reflected in the VPPA, California Civil Code section 1799.3, and CIPA.

219.     Plaintiffs suffered an injury in fact and lost money or property as a result of Defendant's practice of disclosing their personal information in that Plaintiffs paid more in subscription fees than they would have had they been previously aware of Defendant's unfair and unlawful business practice.

220. Had Defendant obtained Plaintiffs' consent to disclose their PII—in the distinct and separate form as required by the VPPA—then Plaintiffs would have been aware of this practice.

221. A reasonable consumer would deem Defendant's disclosure of their personal information to Meta material in determining whether to pay for, or how much to pay for, a subscription to the website because it implicates their right to personal privacy.

222. Likewise, a reasonable consumer would value the video materials and services offered through the website less if they were aware that Defendant disclosed subscribers' personal information to Unauthorized Third Parties, including at least, Meta, each time they used Defendant's services.

223. The difference between what Plaintiffs paid for a subscription to the website and what they would have been willing to pay had they been aware of Defendant's practice of disclosing personal information constitutes economic injury.

224. As a result of the foregoing, Plaintiffs individually are entitled to monetary relief (restitution) in an amount to be established. In addition, Plaintiffs, on behalf of themselves and the general public are entitled to injunctive relief, declaratory relief, reasonable attorneys' fees and costs, and all other relief available at law or equity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming all Plaintiffs as representatives of the Nationwide Class and California Class, where appropriate, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive or other equitable relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: April 24, 2024,                    **ZIMMERMAN REED LLP**

By:    */s/ Jeff Westerman*

Caleb Marker (State Bar No. 269721)
Jeff Westerman (State Bar No. 94559)
6240 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Telephone: (877) 500-8780
Facsimile: (877) 500-8781
E-mail: caleb.marker@zimmreed.com
Email: Jeff.westerman@zimmreed.com

*Attorneys for Plaintiffs Samuel Edwards,*
*Michelle Brown, Dennis Depew, Cinthia Davis,*
*Maritza Hernandez, Siosiua Mafoa, and the*
*Putative Class*


**BURSOR & FISHER, P.A**.
By:    */s/ Neal J. Deckant*
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
          sbogdanovich@bursor.com

*Attorneys for Plaintiffs McMahan and Doe*
*and the Putative Class*

**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
Brandon M. Wise*
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Telephone: (314) 833-4825
E-mail: bwise@peifferwolf.com

*Attorneys for Plaintiffs McMahan and Doe*
*and the Putative Class*

**ALMEIDA LAW GROUP LLC**
David S. Almeida*
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone: 312.576.3024
Email: david@almeidalawgroup.com

*Attorneys for Plaintiffs McMahan and Doe*
*and the Putative Class*

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
By:  ___/s/ John J. Nelson___
JOHN J. NELSON (SBN 317598)
402 W. Broadway, Suite 1760
San Diego, California 92101
Tel.: (872)-365-7060
E-mail: jnelson@milberg.com

*Attorneys for Plaintiff Debjani Sarkar*
*and the Putative Class*


* *pro hac vice* forthcoming